**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**v.**                                                                    **Case No. 8:10-cr-58-T-23TBM**

**LAMONT BELLAMY,**

    **Defendant.**
                                                   /

**REPORT AND RECOMMENDATION**

THIS MATTER is before the court on referral by the Honorable Steven D. Merryday for a Report and Recommendation on Defendant's **Motion to Suppress Illegally Seized Evidence and Request for Evidentiary Hearing** (Doc. 31) and government's response in opposition (Doc. 36). By his motion, Defendant seek suppression of certain firearms, ammunition, and post-arrest statements seized by law enforcement on July 31, 2009, from a residence at 5760 28th Street South, Apt. 239, St. Petersburg, Florida. An evidentiary hearing was conducted May 20, 2010. For the reasons set forth below, I recommend that the motion be denied.

I.

The government introduced testimony from two deputy U.S. Marshals, Ron Lindbak ("Lindbak") and supervisory investigator Miguel Lopez ("Lopez"). Both are assigned to the Florida Regional Fugitive Task Force in Tampa, Florida. According to Lindbak, on or about July 27 or 28, 2009, he was contacted by detective Jeff Manning ("Manning") from the St.

Petersburg Police Department who requested the task force's assistance in locating the Defendant. Manning relayed two addresses where the Defendant was known to reside. The first was that of his girlfriend, Tonesha Rodgers, at 5760 28th Street, South, St. Petersburg, and the other for Defendant's mother at 2161 8th Avenue, North, St. Petersburg. After verifying an outstanding warrant for charges of aggravated assault on law enforcement officers, *see (*Def. Ex. 1), Lindbak and other task force agents undertook surveillance at both residences. At no time did surveillance at the mother's residence reveal anything of significance. Neither did the surveillance on July 29, 2009, at the girlfriend's residence. On July 30, 2009, Lindbak and Lopez undertook to conduct further surveillance and they returned to area of the girlfriend's apartment. On that occasion, they saw a white Mazda 3 vehicle parked near the apartment but backed into the parking space so the license plate was not visible to one driving through the parking lot. Lindbak testified that he had been advised by St. Petersburg Police that the Defendant had used a white Mazda 3 vehicle a few days before while fleeing from the police. Someone maneuvered to a position to observe the license tag and it was confirmed that the tag on this white Mazda 3 was the same as noted by the St Petersburg police. Identifying this vehicle lead both Lindbak and Lopez to believe that the Defendant was present inside his girlfriend's house at that time.

The deputies contacted the St. Petersburg Police Department for assistance and its street crime unit was sent to the scene and set up a perimeter. Lindbak and Lopez proceeded to the apartment manager's office and spoke with unidentified persons who confirmed that Tonesha Rodgers still resided at the complex in apartment 239. Lindbak had a photo of the Defendant, his girlfriend, and also a copy of the NCIC "hit" confirming the outstanding arrest

2

warrant. Someone, possibly the maintenance man at the complex, indicated that the photo of the Defendant looked like someone who had been at the complex previously. The deputies requested that the apartment manager, Barbara Mabee, provide a passkey, which she did. The passkey was requested for purposes of "officer safety." Both Lindbak and Lopez testified that they had been advised that the Defendant was wanted for questioning regarding a homicide and was known to carry weapons. Therefore, they determined to use the key to let themselves into the apartment before the Defendant could react and attempt to flee.

Upon their return to apartment 239, Lindbak used the key to unlock the door. As he did so, he knocked, opened the door, and announced "Police" as he and Lopez entered. The Defendant was seen lying on a couch and he was immediately forcibly arrested. Lindbak testified that while taking the Defendant out of the apartment, he asked for shoes or a shirt or something, and the girlfriend asked if it was okay if she retrieved them. Lindbak indicated that it was and he followed her into a bedroom. There he observed a handgun and Defendant's driver's license (Def. Ex. 3) on a counter and an assault weapon on the shelf in the closet in plain view.

On cross-examination, the deputies acknowledged they did not have a search warrant for the residence and that the entry was based on the outstanding arrest warrant and their belief or "hunch," as Lindbak testified, that the Defendant was inside. Although the NCIC hit listed five different addresses for the Defendant and did not include that of the girlfriend's, the task force conducted surveillance only at the residences of Defendant's mother and girlfriend. Prior to their entry into the apartment, the deputies had neither seen the Defendant at the location nor had they been told by anyone that he was there. Although it is unclear how or

3

when he learned the information, Lindbak acknowledged he knew the car was rented by Tonesha Rodgers, not by the Defendant. According to both deputies, the presence of the Mazda 3 vehicle was a critical factor in their believing the Defendant was inside. They claim the right of entry on the basis of the arrest warrant alone. They did not attempt to get a search warrant before entry as that is not their practice. They chose not to wait until the Defendant exited the apartment or do a "knock and announce" and wait until the door was opened given his prior fleeing from the police, the fact they were advised he carried weapons, and their concern for officer safety.

Andy Kelleher, an investigator with the Federal Public Defender's office, introduced a copy of a lease from Enterprise Leasing Company. The Mazda 3 vehicle had been rented by Tonesha Rodgers on July 27, 2009. *See* (Def. Ex. 5).

The Defendant also introduced testimony from Rodney Tower, a detective with the St. Petersburg Police Department. He was present at the scene on July 30th and spoke with Tonesha Rodgers after the arrest. She advised him that she had known the Defendant for about ten years. He stayed at her apartment on and off and he had stayed there the night before along with his children. She indicated that she had driven to Tallahassee, picked up the kids, and brought them back to the apartment.

The manager of the complex, Barbara Mabee, testified that apartment 239 was rented to Tonesha Rodgers. *See* (Def. Ex. 2). When the deputies came to the office on July 30th, they wanted access to the apartment. They asked for a key or they would take the door down. Rather than have the doors broken down, she provided the key. She was not shown any photographs but others in the front office may have been.

II

A.

Initially, Defendant urges that there is no question that he was an overnight guest at the apartment and thus has standing to object to the Fourth Amendment violations.[1] As for the substance of his argument, he maintains that absent a search warrant permitting entry into the apartment to search for him, the deputies' entry into the residence was in violation of his Fourth Amendment rights and any evidence obtained as a consequence of that violation is appropriately excluded as the fruit of the poisonous tree. While the Defendant does not expressly reference in his motion the import of the outstanding arrest warrant, he argues that absent a search warrant, entry into a residence to conduct a search is permissible only on a showing of probable cause and exigent circumstances[2] or with voluntary consent,[3] neither of which is present here. In response to the government's argument that the deputies were justified in entering the apartment on the authority of the arrest warrant, Defendant argues that

---

[1] In support, Defendant cites *Minnesota v. Olson,* 495 U.S. 91, 98-99 (1990).

[2] Defendant cites *United States v. Burgos,* 720 F.2d 1520, 1525 (11th Cir. 1983).

[3] A good deal of the Defendant's motion addresses the matter of consent and third party consent. However, on this evidentiary record, the argument need not be addressed further as the deputies make no claim of authority to enter the apartment on the basis of consent by either the girlfriend or the apartment manager. The facts reveal that law enforcement had no contact with Tonesha Rodgers prior to the deputies' entry into her apartment and the Defendant's arrest. As a matter of law, the apartment manager had no authority to consent to or otherwise authorize the deputies' entry. *See Chapman v. United States,* 365 U.S. 610 (1961); *Stoner v. California,* 376 U.S. 483 (1964); *United States v. Brazel,* 102 F.3d 1120, 1148 (11th Cir. 1997). While the Court in *Illinois v. Rodriguez,* 497 U.S. 177 (1990), carved out a good faith exception in circumstances of apparent authority where the police, at the time of entry, have a good faith basis to believe consent was given by a person with authority over the premises, the holding left untouched the holding in *Stoner.* In any event, the deputies make no claim that their entry was based on consent from anyone.

5

they were without information to support a reasonable belief that he resided at the apartment or was inside the apartment when they entered. By this argument, Defendant urges that the holding in *Steagald v. United States*, 451 U.S. 204 (1981) is controlling.

In response, the government concedes the general rule from *Steagald* that, absent consent or exigent circumstances, officers must have a search warrant to enter the home of a third party to arrest an individual sought by an arrest warrant. However, it urges that an arrest warrant provides limited authority for officers to enter a dwelling where the suspect lives when there is reason to believe the suspect is inside.[4] Further, officers need only establish, from the totality of the circumstances, a reasonable belief that the suspect resides within the dwelling entered and the fact that the suspect may have a permanent residence elsewhere is not determinative.[5] Here, the government urges that the deputies knew that the Defendant resided at this apartment from time to time, a fact not here disputed by the Defendant, and their investigation revealed sufficient information for them to reasonably conclude that the Defendant resided there and was in the apartment at the time of their entry to execute the arrest warrant. In sum, the government urges that, in the given circumstances, the arrest warrant provided adequate authority for the deputies to enter this apartment. Further, because the Defendant was known to carry firearms, the deputies could properly enter the apartment through use of a pass key on grounds of officer safety.

---

[4] In support, the government cites *Payton v. New York,* 445 U.S. 573 (1980).

[5] Here, the government cites *United States v. Weeks*, 666 F. Supp. 2d 1354, 1368 (N.D. Ga. 2009); *United States v. Magluta,* 44 F.3d 1530, 1537 (11th Cir. 1995); *United States v. Bervaldi,* 226 F.3d 1256, 1263 (11th Cir. 2000); and *United States v. Bennett,* 555 F.3d 962 (11th Cir. 2009).

6

B.

The Fourth Amendment protects people from unreasonable searches and seizures. Generally, a search of a residence without a warrant is per se unreasonable unless law enforcement can bring itself within a recognized exception to the warrant requirement. *See Katz v. United States*, 389 U.S. 347, 357 (1967); *Payton*, 445 U.S. at 586. One exception to the warrant requirement is a search conducted pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). As noted above, I find that consent is not an issue in this case. Another exception to the warrant requirement is found where there is both probable cause and exigent circumstances to justify the search. *Warden v. Hayden*, 387 U.S. 294, 298 (1967); *Vale v. Louisiana*, 399 U.S. 30, 35 (1970). "Probable cause to search exists where the facts lead a reasonably cautious person to believe that the 'search will uncover evidence of a crime.'" *United States v. Burgos,* 720 F.2d 1520, 1525 (11th Cir. 1983) (quoting *United States v. Rojas*, 671 F.2d 159, 165 (5th Cir. 1982)). In this context, "'exigent circumstances' refers to a situation where the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." *Id.* at 1526 (citing *Cady v. Dombrowski*, 413 U.S. 433, 447 (1973)). Common circumstances giving rise to such exigent circumstances are hot pursuit of a fleeing felon, imminent removal or destruction of evidence, the need to prevent a suspect's escape, and the threat of harm to the public or arresting officers from the suspect. *Id.*; *see also Olsen*, 495 U.S. at 100.

In the absence of consent or exigent circumstances, however, the Supreme Court "has consistently held that the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant." *Steagald*, 451

7

U.S. at 211-12 (1981) (citing *Payton*, 455 U.S. 573). In *Payton*, the Court had held that an arrest warrant was required by the Fourth Amendment for an arrest of a suspect inside his home. *Payton*, 455 U.S. at 590. Significant to this case, the Court also stated that, "for Fourth amendment purposes, an arrest warrant founded on probable cause implicitly carries with it limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id.* at 603. In *Steagald,* the Court held that, absent consent or exigent circumstances, a law enforcement officer may legally search for the subject of an arrest warrant in the home of a third party only after obtaining a search warrant. 451 U.S. at 205-06. As the Eleventh Circuit has recognized, later cases interpreted *Steagald* broadly to cover not only homes, but any place in which a third party has a reasonable expectation of privacy. *O'Rourke v. Hayes*, 378 F.3d 1201, 1209 (11th Cir. 2004).

In *Magluta*, the Eleventh Circuit addressed the *Payton* standard for entry into a residence based upon an arrest warrant, noting that *Payton* requires a two-part inquiry. *Magluta*, 44 F.3d at 1533. First, law enforcement must have a reasonable belief that the location to be searched is the suspects's dwelling and, second, the police must have reason to believe that the suspect is within the dwelling. *Id.* In addressing the quantum of proof necessary to satisfy this "reason to believe" standard the court stated:

> We think it sufficient to hold that in order for law enforcement officials to enter a residence to execute an arrest warrant for a resident of the premises, the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry.

*Id.* at 1535.

8

In this circuit, a suspect may have more than one dwelling for purposes of this standard. *See Bervaldi*, 226 F.3d at 1263; *Bennett*, 555 F.3d at 965.

III.

As their arguments demonstrate, both parties claim the benefit of the fact that Defendant occasionally stayed at this residence and that, on the day in question, he was at least an overnight guest. As an overnight guest, Defendant claims standing to contest the illegal entry and search of the apartment. Given the circumstances, the government is compelled to argue that the Defendant resided at this apartment from time to time and was residing at the apartment at the time the deputies entered to effect his arrest. I find that Defendant had a justifiable expectation of privacy in the premises at the time the deputies entered the apartment to effect this arrest and, thus, he may claim the protection of the Fourth Amendment. *See Olson*, 495 U.S. at 98-100.

As for the substantive claim that the deputies' entry into the apartment to effect the arrest of Defendant violates the Fourth Amendment, the issue is a close one. Here, the deputies entered the home of a third person armed only with an arrest warrant for the Defendant. Absent more, *Steagald* teaches that such entry violates the Fourth Amendment and evidence seized as a result of the illegal entry should be suppressed as the fruit of the poisonous tree.[6] Under *Payton*, however, the entry is permissible if the deputies were

---

[6]To the extent that it may be argued that no warrant at all was required under the probable cause and exigent circumstances exception to the warrant requirement, I find the argument fails. Even if the deputies may claim probable cause to believe the Defendant was in the residence, they establish no such emergency situation or exigent circumstances to authorize the entry without a warrant.

9

possessed of sufficient facts and circumstances to support a reasonable belief that the apartment was also Defendant's dwelling and he was present therein at the time of their entry. In this circuit, suspects may have more than one residence under this standard and courts are instructed to "be sensitive to common sense factors" in evaluating both prongs of the *Payton* standard. *See Magluta,* 44 F.3d at 1535; *Bervaldi*, 226 F.3d at 1263.

The evidence reveals that at the time of their entry into this apartment, the deputies had been advised by an officer with the St. Petersburg police that the Defendant was wanted on felony charges and was known to reside with his mother at an address on 8th Avenue North in St. Petersburg and at the 28th Street South address with his girlfriend. Lindbak's warrant check confirmed the outstanding warrant and provided the mother's address and four other addresses for the Defendant not including the girlfriend's address. A driver's license check revealed the address on 8th Avenue North. Surveillance at the 8th Avenue North address gave no indication that Defendant was residing or present there. No effort was made to conduct surveillance at the other addresses listed on the NCIC "hit." The Defendant was not seen at his girlfriend's apartment on 28th Street South prior to the deputies entering the apartment and the deputies were not told by anyone that he was at the premises. However, the deputies were advised by someone, perhaps the maintenance man at the complex, that a person looking like the Defendant had been seen at the complex before. They also had confirmation that the Defendant's girlfriend still resided in the apartment. Also, the deputies had observed a white Mazda 3 vehicle backed into a parking space near the apartment on the morning they entered the apartment. They had not observed it there on the prior day's surveillance. By checking the license plate on the vehicle, they confirmed that the vehicle was the one used by the

10

Defendant a few days previous to elude the St. Petersburg police, who reportedly wished to question him about a homicide.

Here, Defendant urges that the deputies acted on a "hunch" at best, just as Lindbak testified. However, the standard is an objective one.[7] By my consideration, the deputies articulated at least a reasonable suspicion to believe that Defendant resided at, and was present in, the residence at the time of their entry.[8] At that point, they had ostensibly reliable information from the St. Petersburg police that Defendant resided there on occasion. Further investigation confirmed that the girlfriend still resided at that apartment. Significantly, a motor vehicle which Defendant had driven just a few days before to elude the police was parked at the apartment in an arguably suspicious manner. The presence of the vehicle was the key factor in the deputies' decision to act. In *Magluta*, the court noted that the "presence of a vehicle connected to a suspect is sufficient to create the inference that the suspect is at home." 44 F.3d at 1538. I note that in a number of cases relied upon by the government, law enforcement had also observed the suspect entering into and leaving from the residence and that such is lacking here. However, in the given circumstances, i.e., where the Defendant knew the police were looking for him, that fact alone is of lesser import. The fact that the deputies could have waited and effected the arrest after the Defendant exited the apartment is

---

[7] It is not apparent that either deputy was aware of their obligation to obtain a search warrant in circumstances governed by *Steagald,* or that they actually understood the limited authority given them under the *Payton* standard.

[8] As the court in *Magluta* stated, the precise quantum of proof necessary to satisfy the *Payton* "reason to believe" standard remains unclear. While the proof here is fairly minimal, perhaps not rising to the level of probable cause, it is clear to me that the deputies acted on more than a mere hunch or bare suspicion.

11

also of little legal significance.  While, I find this a very close call, I conclude that the deputies articulated a reasonable, common sense basis to believe that Defendant resided at that apartment and was present therein at the time of their entry.

IV.

The Defendant raises no other claim concerning the entry into the apartment or the search.  Accordingly, for the foregoing reasons, I recommend that Defendant's motion to suppress illegally seized evidence (Doc. 31) be **DENIED**.

Respectfully submitted on this
16th day of June 2010.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

**NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days from the date of its service may constitute a waiver of the issues raised herein and shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge.  28 U.S.C. § 636(b)(1); M.D. Fla. R. 6.02.

Copies furnished to:
Honorable Steven D. Merryday, U.S. District Judge
Counsel of Record